IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02461-MEH

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

CETERA ADVISORS LLC, and
CETERA ADVISORS NETWORKS LLC,

      Defendants.

---

# ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court are Defendants' Partial Motion to Dismiss the Amended Complaint (ECF 29) and Plaintiff's Motion to Exclude the Declaration of Martin Joseph Fehn, III (ECF 51). Defendants seek partial dismissal of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), alleging that the First Claim for Relief fails to state a claim to the extent it is premised on certain alleged nondisclosures by Defendants. For the following reasons, the Partial Motion to Dismiss is denied, and the Motion to Exclude is denied as moot based on my decision not to consider the contents of or attachments to the Fehn Declaration.

## STATEMENT OF FACTS

The following are relevant factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Plaintiff in the Amended Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).[1]

Cetera Advisors LLC ("CA") and Cetera Advisors Networks LLC ("CAN") (collectively "Cetera") are separately registered with the SEC as both investment advisers and broker-dealers. Combined they have approximately $30 billion of assets under management, a majority of which is held in discretionary client accounts in which they make investment decisions for their clients. CA and CAN are owned by the same entity, offered similar investment choices and advisory programs, shared compliance personnel, and had nearly identical policies and disclosures. Cetera provides investment advisory services to its clients through over 1,500 investment advisory representatives ("IARs"), including individual retirement investors. These services include investment advice and management of clients' investment portfolios. In exchange for these advisory services, Cetera's clients pay advisory fees to Cetera in the form of a percentage of the clients' managed assets. As an investment adviser, Cetera is a fiduciary to its advisory clients. Cetera received over $21 million as a result of its alleged breaches of fiduciary duty described in the Complaint and below.

Cetera recommended, purchased, and held, on behalf of its clients, shares in mutual fund "share classes" that charged 12b-1 fees. Some mutual fund share classes charge 12b-1 fees to cover fund distribution and shareholder service expenses ("Class A shares"). Such 12b-1 fees are included

---

[1]Although Defendants invite me to scour publicly available Internet documents (provided to me as attachments to their brief) for additional facts ostensibly because they are amenable to judicial notice, I will rely here solely on the Amended Complaint except where otherwise noted. Although I agree that taking judicial notice of factual material on the Internet is appropriate and even necessary at times, Defendants will have the opportunity at the summary judgment stage to rely upon appropriate evidence outside the pleadings. Moreover, because Defendants filed a motion for *partial* dismissal, I do not think it appropriate from a judicial resources perspective to convert the motion to one for summary judgment. Thus, this Order is certainly not the final decision on the merits of Plaintiff's claims, but only on their plausibility.

in the total operating expenses for that particular share class and generally range from fifteen to twenty-five basis points per year. The 12b-1 fees are deducted on an ongoing basis from the fund's assets and are paid to the fund's distributor, who remits the 12b-1 fees to the broker-dealer that sold the shares, in this case Cetera. Many mutual funds offer share classes that do not charge 12b-1 fees ("Class I Shares"). While containing the same portfolio of securities, assuming all other fees are the same, Class I Shares are lower-cost than Class A shares of the same fund. Thus, investors who hold Class I Shares will pay lower total fund operating expenses and earn higher returns than those who hold Class A shares.

In violation of its duty to act in its clients' best interests, Cetera placed (and kept) its advisory clients into higher-cost share classes despite knowing lower-cost share classes were available for the same fund. This conduct also breached Cetera's fiduciary duty to seek best execution, which in this context means failing to seek to purchase the mutual fund share classes for clients in such a manner that the clients' total costs or proceeds in each transaction are the most favorable under the circumstances. Cetera had an incentive to have its clients invest in the higher-cost Class A shares, because it received and shared with its IARs the 12b-1 fees, which was contrary to its clients' interest to own the lower-cost shares.

Cetera was aware of the lower cost shares. From September 2012 it maintained and periodically updated a mutual fund buy list, which included firm-approved mutual funds and share classes that its IARs were directed to use to select mutual funds for their clients ("Mutual Fund Buy List"). For each fund family, the Mutual Fund Buy List included a firm-recommended share class, which typically was the lowest-cost share class. Beginning in 2012, Cetera obtained waivers to allow clients to purchase lower-cost share classes, and those classes were added to the Mutual Fund

Buy List (the "Initiative"). The Initiative was motivated by IARs' requesting access "to lowest cost shares for alignment with their fiduciary obligations."

In June 2013, CA's President and CEO announced to the firm's IARs that by the end of the first quarter of 2014, CA would remove higher-cost share classes from the Mutual Fund Buy List, and IARs would no longer be able to purchase higher-cost share classes. Further, in June 2014, the Initiative recommended that Cetera rebate all 12b-1 fees. Cetera did not implement this recommendation until December 2016. Because Cetera did not implement its own recommendations, its clients held assets in higher-cost mutual fund share classes when otherwise identical, lower-cost share classes of the same fund were available, and Cetera's clients paid and Cetera received $10 million in 12b-1 fees, which Cetera never rebated.

Cetera is required to file and update, at least annually, disclosures in a uniform registration application called a Form ADV. As part of this application, Cetera is required to make certain disclosures in an SEC-mandated Form ADV Part 2A ("Brochure"). The Form ADV, including the Brochure, is designed to provide disclosure to advisory clients so they can understand the firm's economic incentives that might influence the firm's decision-making on the clients' behalf. They also provide a way for clients to compare a firm's fees, compensation, and business practices with other firms. Cetera is required to provide its Brochure to its clients and prospective clients and provide updated Brochures or summaries of material changes to clients going forward.

Cetera's Form ADV Brochure included the following language from March 2013 through December 2016[2]:

---

[2]The Amended Complaint includes some of this language, but the complete advisement is provided here.

Accounts may invest in load and no-load mutual funds that may pay the firm annual distribution charges, sometimes referred to as 12(b)-1 fees. . . . When 12(b)-1 fees are paid to us, for investments made in Preferred and Prime non-retirement accounts, a portion is passed to your advisor. The Firm will retain 12(b)-1 fees received for Premier non-retirement accounts. Because of the additional compensation that these payments represent, there is a financial incentive for your advisor to recommend funds that pay 12(b)-1 fees over funds that have no fees or lower fees.

Cetera failed to advise its clients that they were being invested in higher-cost share classes that paid 12b-1 fees when lower-cost share classes were available for the same mutual funds. By omitting any mention of share class distinctions, Cetera failed to inform its clients that as their investment adviser it was recommending share classes that paid it 12b-1 fees when a less-costly share class of the same mutual fund was available. Further, from March 2013 through December 2016, Cetera disclosed it "may" invest in load and no-load mutual funds that "may" pay 12b-1 fees. However, Cetera's Brochures said nothing about the existence of multiple share classes within mutual funds, or its conflict of interest associated with receiving additional compensation by placing client assets in higher-cost share classes when a lower-cost share class of the same fund was available. Moreover, the Mutual Fund Buy List allowed Cetera's IARs to purchase higher-cost share classes for clients who were already paying 12b-1 fees to Cetera, while also informing its IARs that they were required to invest new clients in the "recommended" lower-cost share class. Cetera did not disclose this disparate treatment of its clients. Finally, prior to June 2015, Cetera's Brochures falsely represented that "[t]o help mitigate this conflict of interest [from receiving 12b-1 fees], we monitor the sales activity of our [IARs] to ensure that the products and services they offer to you are appropriate for your specific situation." In fact, Cetera did not evaluate whether it had placed its advisory clients in the most favorable share class.

Cetera put its clients in mutual funds offered by a third-party broker-dealer (the "Clearing

Broker").   The Clearing Broker offered its no-transaction-fee mutual fund program (the "NTF Program") to Cetera.   The NTF Program had two sub-programs: (a) no-load mutual funds that did not pay sales commissions ("NTF A"), and (b) "load" mutual funds where the Clearing Broker waived the sales commissions if purchased in fee-based advisory accounts ("NTF B").   The amount of revenue that the Clearing Broker shared with Cetera was based on the amount of client assets Cetera invested in the mutual funds in NTF A.   When Cetera selected an investment for a client, it had more than one mutual fund to choose from, including the choice of selecting other investments or mutual funds that did not participate in NTF A.   Cetera's receipt of compensation through NTF A created a material conflict of interest, because it incentivized Cetera to invest client assets through NTF A over other investments.

Prior to June 2015, Cetera's Brochures did not have any disclosures related to the compensation it received from investing clients in mutual funds through NTF A.   Both before and after June 2015, Cetera did not have any disclosures detailing the program or explaining the conflict of interest this arrangement presented.   Starting in June 2015, Cetera misleadingly disclosed in its Brochure that the Clearing Broker "may" pay it a share of the fees the Broker received from mutual funds that participated in NTF A.

Starting in September 2014, Cetera began receiving yet more money from the Clearing Broker based on Cetera investing clients in mutual funds.   At this time, the Clearing Broker agreed to pay Cetera a percentage of service fees it received from NTF B funds as well as certain service fees the Clearing Broker received from mutual funds participating in the Clearing Broker's "transaction-fee" mutual fund program, called "TF Program."   As a result, Cetera was incentivized to recommend mutual funds for which it received this compensation from the Clearing Broker over

other investments when rendering investment advice to its clients.  During the relevant periods, Cetera did not disclose TF Program service fees and made no or inadequate disclosures relating to NTF B service fees, even though Cetera represented to the Clearing Broker that it had disclosed this information to its clients.

Cetera's agreement with the Clearing Broker set forth fees that Cetera would pay to the Clearing Broker for the broker providing certain services to Cetera's clients unless Cetera instructed the Clearing Broker to charge these fees to Cetera's clients directly.  This agreement also itemized certain services that "may be billed directly to the client with a customized markup," including things like inactive account fees and confirmation fees ("NTF Mark-Ups").  Cetera directed the Clearing Broker to mark up these fees by a specific amount, charge Cetera's clients directly, then remit that marked-up portion to Cetera.  Accordingly, with Cetera's knowledge and at its direction, the Clearing Broker added a material amount of NTF Mark-Ups – up to 300% – to the Clearing Broker's fees, which the Clearing Broker paid to Cetera.  The Clearing Broker would directly charge Cetera's clients (and retain) a fee for performing the service and also charge a mark-up on that fee in an amount that Cetera determined and retained.  Despite the agreement with the Clearing Broker providing that Cetera was responsible for notifying its clients of any mark-up, Cetera failed to do so.  Even if Cetera's clients requested a "fee schedule" which was available from their IAR, that schedule did not show the mark-up that Cetera charged.  Cetera received $3.5 million of NTF Mark-Ups, which created a financial incentive for it to continue to use the Clearing Broker so it could receive NTF Mark-Ups.

Cetera had policies and procedures contained in its Written Supervisory Procedures and IAR Manuals (collectively "Compliance Manual") for disclosing all material facts including conflicts of

interest. Cetera's Compliance Manual instructed that Cetera "should fully and accurately disclose the material facts regarding the true costs of any recommended product and disclose any actual or potential conflict of interest that could impair the objectivity" of Cetera, and that Cetera and its IARs "should fully and accurately disclose the material facts regarding the true costs, benefits and limitations of any service or product recommended and disclose any actual or potential conflict of interest that could impair the objectivity" of the adviser or its IARs. Cetera failed to implement these policies and procedures. Among other things, it did not disclose the true cost of investing in specific mutual fund shares or the conflict resulting from it receiving 12b-1 fees. Cetera's Compliance Manual also instructed its IARs that they could only purchase share classes that appeared on the Mutual Fund Buy List and that IARs must recommend the "most favorable share class" to its clients. As discussed above, Cetera failed to implement these internal procedures.

## LEGAL STANDARDS

A.  **Standard under Fed. R. Civ. P. 12(b)(6)**

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely

8

conclusory. *Id.* at 680.  Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

Plausibility refers "'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011).  Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1192.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

9

B.     **Materiality Standard**

I agree with Plaintiff concerning "[t]he general rule . . . that materiality in the context of a

Section 206(2)[3] claim is a fact-intensive inquiry that will be left for the jury to determine."  *Sec. &*

*Exch. Comm'n v. Gruss*, 245 F. Supp. 3d 527, 597 (S.D.N.Y. 2017); *see also Bielski v. Cabletron*

*Sys., Inc. (In re Cabletron Sys., Inc.)*, 311 F.3d 11, 34 (1st Cir. 2002) ("In general, the materiality

of a statement or omission is a question of fact that should normally be left to a jury rather than

resolved by the court on a motion to dismiss.").  On the other hand, "the ultimate issue of materiality

[may be] appropriately resolved as a matter of law" when "the established omissions are so

obviously important to an investor that reasonable minds cannot differ on the question of

materiality."  *Gruss*, 245 F. Supp. 3d at 597 (citations omitted).  The Supreme Court has defined a

"material" fact as one that, if omitted, "'would have been viewed by the reasonable investor as

having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*,

485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976))

(the standard upon which Defendants also rely).  Defendants cite case authority in which a motion

---

[3]The Amended Complaint raises violations of Sections 206(2) and 206(4) of The
Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(2), 80b-6(4), and Rule 206(4)-7
thereunder, 17 C.F.R. § 275.206(4)-7.

to dismiss was affirmed on appeal on the basis of non-materiality of the alleged omissions.[4]  I will

keep these principles in mind as I review the sufficiency of the Amended Complaint.

## DISCUSSION

Plaintiff notes several obligations that Cetera has, with which Defendants do not disagree:

(1) a fiduciary obligation to its clients, *see* Mot. at 3, 19; (2) making full and frank disclosures to its

clients, *see* Reply at 1; (3) revealing conflicts of interest, *see* Mot. at 22; and (4) permitting clients

to render informed consent in the event of conflicts of interest, *see* Mot. at 11, Rep. at 9.

Specifically with regard to Cetera's Form ADV Brochure's advisement concerning 12b-1

fees, Plaintiff contends the disclosure's use of the word "may" ("[a]ccounts may invest in load and

no-load mutual funds that may pay the firm annual distribution charges, sometimes referred to as

12(b)-1 fees"; "[t]he firm may have an incentive to promote" one program over another) was

misleading, because Cetera in fact did so invest in funds that did pay the firm distribution charges,

resulting in an actual conflict of interest.  I do not disagree that, in isolation, Plaintiff might have

difficulty in plausibly stating a violation based on these differences, but in the totality of the alleged

conduct, the Amended Complaint satisfies the *Iqbal/Twombly* standard.  Several cases in the last

year appear to have sided with the Plaintiff on the importance of disclosing the fee-gathering activity

as an actual practice rather than a hypothetical one.  *See Robare Group, Ltd. v. SEC*, 922 F.3d 468,

---

[4]The Amended Complaint does not directly allege that Defendants' alleged inadequate disclosure on conflicts and other failings, if remedied, would have constituted an alteration of the total mix of information available to investors, *see Sacerdote v. New York Univ.*, No. 16-CV-6284 (KBF), 2017 WL 4736740, at *2 (S.D.N.Y. Oct. 19, 2017) (failure to sufficiently allege an alteration of the total mix constitutes grounds for dismissal), nor does it contain a definition of materiality.  However, the Amended Complaint is replete with allegations of omissions of "material" facts, and I do not believe its lack of certain terms of art justifies dismissal here.

11

472 (D.C. Cir. 2019); *SEC v. Westport Capital Markets LLC*, 408 F. Supp. 3d 93, 99 (D. Conn. 2019).

Defendants rely on an SEC administrative order in *In the matter of Everhart Financial Group*, *Inc.*, 113 SEC Docket 1190, 2016 WL 159329 (Admin. Order Jan. 14, 2016).   That case involved the SEC simultaneously bringing and settling claims, with the Order adopting the settlement.   Defendants argue that in *Everhart* the SEC "tacitly acknowledged that disclosing the conflict in . . . terms [such as "may" and "could"] would not alter the total mix of information for a client."   Mot. at 30.   First, it is my experience that many factors go into approving a settlement that are not present in a fully litigated case; therefore, an order approving a settlement has less precedential value.   Second, a tacit approval in an administrative proceeding that is focused on a settlement of a case is not substantial authority.   Moreover, Plaintiff submits other SEC authority that supports a contrary conclusion.

Defendants also argue that use of the term "fund" encompasses "share classes" within that fund, while Plaintiff agues that disclosure of the various share classes, how they operate, and their respective impact on an investor's total return constitute necessary information for an investor. Without such information, Plaintiff argues, Cetera has not met its fiduciary obligation.   I do believe that, again in the context of the entire Amended Complaint, disclosing the existence of share classes within a fund that have a different fee structure, and that an investor can choose among share classes, might be material information that affects the total mix of information available.

The parties next present argument concerning Cetera's fees received from the Clearing Broker.   As noted above, Cetera shared with the Clearing Broker service fees based on Cetera's clients' holdings in the NTF Program.   Defendants' fundamental contention is that they shared fees

12

for *all* mutual funds they offered, so there was no conflict because there was no material incentive to recommend one fund over another.  Plaintiff argues that because of the "millions of dollars" that Defendants received in the several different types of fees associated with mutual funds (revenue sharing payments and administrative service fees), Cetera had incentive to put clients into the NTF Program as opposed to other types of investments that did not pay Cetera that level of fees. Defendants state that mutual funds are overwhelmingly popular and are "central to most individuals' investment portfolios such that the IARs would have purchased these investment products for client accounts wth or without the shared fees."  Mot. at 31.  Defendants rely on practical considerations that I cannot indulge in adjudicating a motion to dismiss.  Their argument may be very strong on summary judgment, but for now, I may only determine the plausibility of Plaintiff's claims.

Beyond the materiality argument, Defendants assert that, in any event, the potential conflict was adequately disclosed.  For this, Defendants rely on Internet web pages that no longer exist.  As noted above, I will not, for this analysis, take judicial notice of such evidence, unless incorporated by reference into the Amended Complaint.  Moreover, Plaintiff notes that (1) some of the Internet evidence is outside the claim period; (2) Cetera cannot prove, at this point, that its clients received such information; (3) direct disclosure obligations may not be accomplished indirectly through the Internet; and (4) even relying on the disclosures from Cetera's website, the Amended Complaint's allegations of failure to disclose would survive.  As I have found above, for purposes of a 12(b)(6) motion to dismiss, Plaintiff has plausibly stated claims based on Defendants' use of terms such as "may" in the context of the totality of the allegations of the Amended Complaint.  Further, Plaintiff argues that as to some fee revenue (administrative fees), Cetera made no disclosures whatsoever.

The parties also address the practice of  "NTF mark ups."  Plaintiff alleges Cetera directed

13

the Clearing Broker to mark up the fees, received $3.5 million in such fees, did not inform clients that fees which they thought were paid to the Clearing Broker were passed to Cetera, and did not disclose this conflict of interest.   Defendants' principal argument is that they "adequately communicated the material facts necessary to allow clients to make appropriate inquiries and an informed decision."   Mot. at 36.   A consistent theme for Defendants' Motion to Dismiss is that information Cetera *did* provide through various means (other than directly to the investor) would permit an interested investor to discover all material facts necessary to reveal any conflict of interest. Plaintiff asserts that Defendants' obligations of direct disclosure are very specific and cannot be accomplished indirectly.   I believe that is a matter that must be more fully developed than the current record and, thus, cannot be resolved in a motion to dismiss.

The last issue on the merits of the Plaintiff's claims is whether Cetera adopted and implemented written compliance policies and procedures that were reasonably designed to prevent violations of Section 206(4) of the Advisers Act.   Although I believe, based on the parties' stated positions, that this may be a difficult claim to prove on the merits, because any such analysis would necessarily rely on a detailed consideration of the totality of Cetera's policies and procedures, which are not before me on this 12(b)(6) record, dismissal is not appropriate.

Finally, Defendants request dismissal of the Plaintiff's claim for disgorgement.   The parties agree that the issue of the SEC's right to seek disgorgement in federal court is before the United States Supreme Court, and a decision is likely to be rendered prior to this lawsuit's adjudication on the merits.   For this reason, I think it prudent to deny the motion to dismiss Plaintiff's prayer for relief seeking disgorgement without prejudice and reserve that issue for a later date.

## **CONCLUSION**

After reviewing the Amended Complaint and the parties' briefing, I conclude that Plaintiff has stated plausible claims for violations of Sections 206(2) and 206(4) of The Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(2), 80b-6(4), and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7.  Accordingly, Defendants' Partial Motion to Dismiss the Amended Complaint (ECF 29) is **denied**.  Further, based on my decision not to convert the Partial Motion to Dismiss to a motion for summary judgment, Plaintiff's Motion to Exclude the Declaration of Martin Joseph Fehn, III (ECF51) is **denied as moot**.[5]

Dated at Denver, Colorado, this 17th day of April, 2020.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge

---

[5]Although the Motion to Exclude is not fully briefed, the merits of Defendants submitting information outside the pleadings has been addressed by both parties in their briefs on the Partial Motion to Dismiss, as well as in this Order, and no further briefing is necessary.  In addition, this Court's Local Rules permit a decision on a motion prior to completion of briefing if appropriate.  *See* D.C. Colo. LCivR 7.1(d).