IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02461-MEH

SECURITIES AND EXCHANGE
COMMISSION,
                    Plaintiff,

v.

CETERA ADVISORS LLC,  and
CETERA ADVISOR NETWORKS LLC

                    Defendants.

---

## SECOND AMENDED COMPLAINT

---

Plaintiff United States Securities and Exchange Commission (the "SEC") alleges as follows against Defendants Cetera Advisors LLC ("Cetera Advisors") and Cetera Advisor Networks LLC ("Cetera Advisor Networks") (collectively, "Defendants" or "Cetera"):

## SUMMARY OF THE ACTION

1.      Cetera Advisors and Cetera Advisor Networks are SEC-registered investment advisers, which are both owned by Cetera Financial Group, Inc. ("Cetera Financial Group").  As investment advisers, Cetera Advisors and Cetera Advisor Networks owe their advisory clients a fiduciary duty to act in their clients' best interests and to fully disclose all material facts about the advisory relationship, including disclosing any conflicts of interest that might cause them to put their own interests before those of their clients.  Cetera Advisors and Cetera Advisor Networks both breached their fiduciary duty and regularly and repeatedly put their financial interests ahead of their clients.  Collectively, the Defendants received more than $21 million from breaching their fiduciary duty and defrauding their clients.

2.      Investors paid Cetera Advisors and Cetera Advisor Networks to select and manage their investments in a manner consistent with their fiduciary duty, but the Defendants continuously recommended and invested client assets in investments that cost clients more when less expensive, identical investments were available.  Both entities also failed to disclose that they had numerous, material conflicts of interest in providing investment advice to their clients, including that some investment choices generated millions of dollars of additional revenue for the Defendants, while other investment choices would have generated much less or no additional revenue.

3.      Over the course of several years, both Cetera Advisors and Cetera Advisor Networks defrauded their advisory clients and repeatedly breached their fiduciary duties that they owed to them in four primary ways.

4.      First, from at least September 8, 2012 through December 31, 2016 for Cetera Advisors and from at least April 20, 2014 through December 31, 2016 for Cetera Advisor Networks (collectively, the "Relevant 12b-1 Period"), Defendants breached their fiduciary duty to their clients and failed to act in their clients' best interests by a) selecting and holding mutual fund investments that cost their clients more (and paid Defendants more) when they knew that lower-cost, otherwise identical investments were available to their clients and b) failing to properly disclose this practice or their conflict of interest.  These higher-cost, otherwise identical investments were different "share classes" within the same mutual fund, where each share class represents an interest in the *exact same portfolio of securities*.  Defendants invested clients in higher-cost, otherwise identical share classes, which paid additional compensation to them for as long as their clients held these investments.  As a result, Cetera Advisors and Cetera Advisor Networks had an incentive to invest and maintain client assets in these higher-cost share classes

2

that paid them additional compensation.  During the Relevant 12b-1 Period, Defendants' clients paid millions of dollars in unnecessary fees and they received at least $10 million more than if the client's assets were invested in the lower-cost share classes.

5.     <u>Second</u>, from at least September 8, 2012 for Cetera Advisors, and from at least April 20, 2014 for Cetera Advisor Networks (collectively, the "Relevant Revenue Sharing Period") breached their fiduciary duty to their clients in connection with their receipt of compensation from a third-party broker-dealer (the "Clearing Broker") that they received for investing Cetera's advisory clients in certain mutual funds (hereinafter, "Revenue Sharing").  In this arrangement, the Defendants had a clear conflict of interest in that they received additional compensation for investing clients in certain mutual funds that paid Revenue Sharing over other mutual funds that did not, and because this arrangement provided a financial incentive for them to maintain their relationship with the Clearing Broker so Defendants could continue to receive revenue sharing.  Cetera Advisors and Cetera Advisor Networks both failed to disclose adequately to their clients this practice or the financial conflict stemming from their receipt of such compensation.  Defendants invested clients in mutual funds that paid them Revenue Sharing and received at least $4.1 million as a direct result of these investments.

6.     <u>Third</u>, from at least September 1, 2014 through March 29, 2018 for Cetera Advisors and from at least April 20, 2014 through March 29, 2018for Cetera Advisor Networks (collectively, the "Relevant Service Fee Period"), Defendants also failed to disclose the conflict stemming from their receipt of at least $4.3 million of compensation that certain mutual funds paid to the Clearing Broker, which the Clearing Broker then shared with Defendants.  These payments created a conflict of interest because they provided a financial incentive for Cetera Advisors and Cetera Advisor Networks to select the mutual funds that paid these fees over other

investments when providing investment advice to their advisory clients, and because this arrangement provided a financial incentive for Defendants to maintain their relationship with the Clearing Broker so they could continue to receive service fees.  However, Cetera Advisors and Cetera Advisor Networks failed to disclose adequately to their clients this arrangement and the resulting conflict of interest.

7.      Fourth, from at least September 8, 2012 through March 29, 2018 for Cetera Advisors and from at least April 20, 2014 through March 29, 2018 for Cetera Advisor Networks (collectively, the "Relevant Non-Transaction Fee Mark-Up Period"), Defendants directed the Clearing Broker to mark-up certain fees ("non-transaction fees") by up to 300% that the Clearing Broker charged their advisory clients.  After the Clearing Broker received these fees from Defendants' clients, the Clearing Broker paid these fees to Defendants.  However, Cetera Advisors and Cetera Advisor Networks failed to disclose this practice, the additional fees that Cetera charged, or the resulting conflict to their advisory clients.  These payments created a conflict of interest because Defendants had discretion to direct the Clearing Broker to mark-up certain non-transaction fees, which they then received indirectly from their advisory clients, and because this arrangement provided a financial incentive for Defendants to maintain their relationship with the Clearing Broker so they could continue to receive these undisclosed non-transaction mark-ups.   These undisclosed non-transaction fee mark-ups yielded Defendants at least $3.5 million.

8.      Through the conduct alleged herein, Cetera Advisors and Cetera Advisor Networks have violated, and unless restrained and enjoined will continue to violate, Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-7 thereunder [15 U.S.C. §§ 80b-6(2), 80b-6(4), 80b-7 and 17 C.F.R. § 275.206(4)-7].  The SEC requests that the Court enter a

permanent injunction prohibiting Cetera Advisors and Cetera Advisor Networks from further violations of these provisions and order each of them to disgorge, with pre-judgment interest, their ill-gotten gains from the conduct alleged in the Complaint pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].  Additionally, the Court should order Cetera Advisors and Cetera Advisor Networks to each pay civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].  As Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to Sections 209(d), 209(e)(1), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1), and 90b-14].

10.      Venue is proper in this District under Section 214 of the Advisers Act [15 U.S.C. § 80b-14] and 28 U.S.C. § 1391(b)(1) and (2) because, among other things, certain acts or transactions constituting the violations of the federal securities laws detailed herein occurred in this district and because, at all relevant times, Cetera Advisor's principal place of business was in Denver, Colorado, and Cetera Advisors and Cetera Advisor Networks are both registered with the State of Colorado and have investment advisory representatives ("IARs") working for them within the State of Colorado.  In addition, many of the acts and practices described in this Complaint occurred in the District of Colorado, including, but not limited to, Cetera Advisors, and based on information and belief, Cetera Advisor Networks, acting as an investment adviser to Colorado residents.

11.      In connection with the transactions, acts, practices, and courses of business described in this Complaint, Cetera Advisors and Cetera Advisor Networks, directly and

indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments of transportation or communication in interstate commerce.

12.     Cetera Advisors entered into eight separate tolling agreements to toll the running of any statute of limitations against it from September 7, 2017 through September 2, 2019. Cetera Advisor Networks entered into three separate tolling agreements to toll the running of any statute of limitations against it from March 13, 2019 through September 2, 2019.  Accordingly, based on these tolling agreements and the applicable statute of limitations, the SEC does not seek monetary relief due to misconduct by Cetera Advisors before September 8, 2012 and due to misconduct by Cetera Advisor Networks before April 20, 2014.

## DEFENDANTS

13.     **Cetera Advisors LLC,** located in Denver, Colorado, is a dually registered investment adviser and broker-dealer.  Cetera Advisors is an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] and first registered as an investment adviser with the SEC in 1988.  Cetera Advisors has been registered as a broker-dealer since 1981.  Cetera Advisors is in the business of providing investment advice concerning securities for compensation, and has approximately $12 billion of retail client assets under management, a majority of which is associated with discretionary client accounts.

14.     **Cetera Advisor Networks LLC**, a Delaware Limited Liability Company has been registered with the Commission as an investment adviser and broker-dealer since 1994 and 1983, respectively.  Cetera Advisor Networks is in the business of providing investment advice concerning securities for compensation, and has approximately $18 billion of retail client assets under management, a majority of which is associated with discretionary client accounts.

## FACTS

I.   **Defendants are Both Owned by the Same Entity, Are Registered Investment Advisers, and Owe a Fiduciary Duty to Their Clients.**

15.     Cetera Advisors and Cetera Advisor Networks both provide investment advisory services to a variety of clients, including individual retail clients who rely on investments in their Cetera advisory accounts for, among other things, income and retirement.  These advisory services include both investment advice and the ongoing management of clients' investment portfolios.  Defendants provide advisory services through over 1,500 IARs, many of whom are also registered representatives of Defendants' broker-dealer.

16.     In exchange for these advisory services, Defendants' clients pay advisory fees to Cetera Advisors and Cetera Advisor Networks, which are agreed-upon percentages applied to the value of the client's assets under the firms' management.  The fees are periodically deducted from the clients' advisory accounts.

17.     Cetera Financial Group is the parent company and direct owner of Cetera Advisors and Cetera Advisor Networks.  Cetera Financial Group provides strategic and organizational oversight for Cetera Advisors and Cetera Advisor Networks.  Cetera Financial Group maintains an Executive Committee ("Executive Committee") that consists of key employees, who also held the same job title, same roles and responsibilities and operated in essentially the same manner at Cetera Advisors and Cetera Advisor Networks.  In addition, Cetera Financial Group provided to Defendants common internal services and departments, such as due diligence, compliance, legal, advisory compliance, IT and operations.  Defendants both offered similar investment choices and advisory programs to their clients.

18.     Cetera Advisors and Cetera Advisor Networks had the same parent company, compliance personnel, and working groups on key issues relating to the misconduct and

implemented nearly identical policies regarding the availability of mutual fund share classes and made nearly identical disclosures.

19.    As registered investment advisers with the SEC, Defendants are required to file and update, at least annually, disclosures in a uniform registration application called a Form ADV.  As part of this application, Defendants are required to create an SEC-mandated Form ADV Part 2A or commonly referred to as brochures ("Brochures"), containing certain disclosures about their advisory business.

20.     Defendants are also required to create Forms ADV Part 2B, commonly referred to as brochure supplements ("Brochure Supplements").  Brochure Supplements contain information that is specific to the IARs that are providing investment advice to the particular client.

21.    As investment advisers, Cetera Advisors and Cetera Advisor Networks are fiduciaries for their advisory clients.  As such, Defendants owe their advisory clients an affirmative duty of utmost good faith, are obligated to provide full and fair disclosure of all material facts, have an affirmative obligation to employ reasonable care to avoid misleading their clients, have a duty to act in their clients' best interests, and have a duty to seek best execution of a client's transactions.  Defendants' duty to disclose all material facts includes a duty to tell clients about all of their actual or potential conflicts of interest that might incline Cetera or their IARs to render investment advice that is not disinterested.

22.    Defendants and their IARs acknowledged this fiduciary duty in, among other places, their Part 2Bs of Form ADV, which Defendants and their IARs were required to provide to clients.  For instance, Defendants disclosed to their clients that they maintain "a Code of Ethics requiring your Advisor *to always act in your best interest* and maintains a supervisory

structure to monitor the advisory activities of your Advisor in order to reduce potential conflicts of interest."  (Emphasis added.)  Cetera Advisors and Cetera Advisor Networks also consistently acknowledged their fiduciary obligations to their advisory clients in their internal compliance manuals.

II.   **Defendants Violated Their Fiduciary Duties In Multiple Ways in Connection with Their Selection of Mutual Fund Share Classes.**

    A.   **Background on Mutual Funds, Share Classes, and 12b-1 Fees**

23.   Cetera Advisors and Cetera Advisor Networks recommended the purchase of shares in mutual funds to their clients, purchased shares in mutual funds on behalf of their clients, and held client assets in shares of mutual funds.

24.   A mutual fund is a professionally managed investment fund that pools money from many investors and invests the money in securities or other assets.  A family of funds is a group of mutual funds that are all marketed and administered under the same fund family or company name.

25.   Separate mutual *funds* typically differ from each other in many respects (*e.g.*, they would typically include different investments and have different investment objectives).  Each mutual fund often has multiple, different "share classes."  Each *share class* of a mutual fund represents an interest in the exact same portfolio of securities, with the only principal difference typically being the cost to the investor.

26.   Some mutual fund share classes charge fees pursuant to Rule 12b-1 under the Investment Company Act of 1940 ("12b-1 Fees") to cover fund distribution and shareholder service expenses (hereinafter, "Class A shares").  12b-1 Fees are recurring, are included in a mutual fund's total annual fund operating expenses for that share class, vary by fund and by share class within a fund, and typically range from 15 to 25 basis points per year.  One basis

point is equal to one hundredth of one percent.   The 12b-1 Fees are deducted on an ongoing basis from the mutual fund's assets attributable to that class and paid to the fund's distributor or principal underwriter, which generally remits the 12b-1 Fees to the broker-dealer that distributed or sold the shares.

27.     Cetera Advisors and Cetera Advisor Networks both received 12b-1 Fees from the mutual funds in which they held clients assets.  The 12b-1 Fees were material to Defendants investors, and Defendants knew or should have known that these fees were material.

28.     During the Relevant 12b-1 Period, Cetera Advisors and Cetera Advisor Networks purchased on behalf of their clients, recommended, or held client assets in mutual fund share classes that charged 12b-1 Fees typically ranging between 15 to 25 basis points per year.

29.     Many mutual funds also offer other share classes that do not charge 12b-1 Fees and that go by a variety of names (*e.g.*, "Class F2," "Class Y," "Class Z," "Advisory," or "Institutional" class shares (collectively, "Class I Shares")).

30.     Over approximately the last fifteen years, mutual funds have increasingly made Class I Shares available to advisory clients through, among other things, the creation of new adviser and institutional share classes or the utilization of existing institutional shares classes, all with either waived or reduced minimum purchase amounts that are similar and in many instances identical to minimum purchase amounts for Class A shares.

31.     While invested in the same portfolio of securities, Class I Shares are lower-cost than Class A shares of the same fund.  An investor who holds Class I Shares of a mutual fund will pay lower total annual fund operating expenses – and thus will earn higher returns – than one who holds Class A shares of the same fund.  Therefore, if a mutual fund offers a Class I

Share, and an investor is eligible to own it, it is almost always better for the investor to purchase or hold the Class I Share because his or her returns will be higher.

> **B.      Defendants Violated Their Fiduciary Duty to Act in Their Clients' Best Interests by Having Their Clients Invest and Hold Assets in Higher-Cost Share Classes Despite Knowing Lower-Cost Share Classes Were Available.**

32.      Cetera Advisors and Cetera Advisor Networks owed their advisory clients a fiduciary duty to, among other things, act in their clients' best interests.  In violation of this duty, Cetera Advisors and Cetera Advisor Networks put their advisory clients into higher-cost share classes and kept them in the higher-cost shares despite knowing lower-cost share classes were available to their clients.

<u>**Defendants Knew Lower-Cost Share Classes Were Available.**</u>

33.      Mutual funds in which Cetera Advisors and Cetera Advisor Networks purchased shares on behalf of their clients, recommended the purchase of shares, or in which they held client assets, maintained multiple share classes, including Class A and Class I Shares.

34.      From at least September 2012, Cetera Advisors and Cetera Advisor Networks maintained and periodically updated a mutual fund buy list, which included firm-approved mutual funds and their respective share classes that were made available to their IARs to select for their advisory clients (the "Mutual Fund Buy Lists").  For each fund family on the Mutual Fund Buy Lists, Cetera Advisors and, based on information and belief, Cetera Advisor Networks included a firm-recommended share class, which typically was the lowest-cost share class for each fund (*i.e.*, Class I Shares or equivalent).

35.      The due diligence department for the Defendants had decision-making authority for choosing the funds and share classes that were made available to IARs on the Mutual Fund Buy Lists.  Beginning in late 2012, such due diligence department began a concerted effort to obtain agreements (also known as "waivers") from mutual fund families to make Cetera's

advisory clients eligible to purchase certain lower-cost mutual fund share classes. After obtaining such waivers, these lower-cost share classes were added to the Mutual Fund Buy List of Cetera Advisors and, based on information and belief, Cetera Advisor Networks, and made available to Defendants' clients in their advisory programs. This was referred to internally at Cetera as the "Institutional Share Class Initiative."

36.     According to Cetera's own internal documents, the objective of the Institutional Share Class Initiative was "to remove the conflicts of multiple share classes for the same fund families" and was motivated, at least in part, by IARs requesting access "to lowest cost shares for alignment with their fiduciary obligations."

37.     In June 2013, Cetera Advisors' President and Chief Executive Officer announced to firm IARs that by the end of the first quarter of 2014 higher-cost share classes would be removed from the Mutual Fund Buy List and IARs would no longer be able to purchase on behalf of Cetera clients higher-cost share classes or add to existing positions within those share classes. By July 2014, Cetera had obtained access to lower-cost share classes from over 90% of the fund families it offered to its advisory clients. These lower-cost share classes appeared on the Mutual Fund Buy Lists of Cetera Advisors and, based on information and belief, Cetera Advisor Networks.

### Cetera Discussed Internally How to Address the Fact that Lower-Cost Share Classes Were Available to Clients.

38.     During the Relevant 12b-1 Period, the Executive Committee was composed of senior-level executives of Cetera Financial Group as well as the leadership of its related firms, including Defendants' Presidents and Chief Executive Officers. The Executive Committee provided strategic and organizational oversight for Defendants that included deliberation over, and consideration of, initiatives and projects that impact the advisory businesses of Cetera

Advisors and Cetera Advisor Networks.  During the Relevant 12b-1 Period, the Executive Committee considered how to address clients of Cetera Advisors and Cetera Advisor Networks who held higher-cost share classes given that lower-cost share classes of the same fund were available.

39.     As part of the Institutional Share Class Initiative, the Executive Committee considered two primary options: converting current client positions to the lower-cost share class and/or rebating 12b-1 Fees to all advisory clients.

40.     In June 2014, the Institutional Share Class Initiative culminated in a recommendation to the Executive Committee that Cetera rebate 12b-1 Fees to all advisory clients.  However, several years passed and millions of dollars of unnecessary fees were paid by Defendants' clients before they implemented this recommendation.

**Despite Knowing that Lower-Cost Share Classes Were Available to Their Clients and Having Access to These Lower-Cost Share Classes, Defendants Invested and Held Client Assets in Higher-Cost Share Classes.**

41.     Notwithstanding their success in obtaining waivers that allowed Defendants' IARs to place advisory client assets in various lower-cost mutual fund share classes, from at least June 2014 through the end of December 2016, Cetera Advisors and Cetera Advisor Networks continued to invest or hold advisory client assets in higher-cost mutual fund share classes that paid them more when otherwise identical, lower-cost share classes of the same fund were available.

42.     In the fourth quarter of 2015 alone, for example, approximately 675 accounts at Cetera Advisors purchased approximately $25.6 million of higher-cost share classes during the quarter, even though Cetera Advisors knew or should have known that lower-cost share classes were available to the clients.

43.     Even after Defendants knew or should have known that lower-cost share classes

were available (*e.g.*, they obtained a waiver and/or the share class appeared on the Mutual Fund

Buy Lists), Defendants continued to maintain clients in higher-cost share classes for years.

Defendants' decisions to keep clients in the higher-cost share class resulted in their clients

continuously paying the recurring 12b-1 Fees and additional compensation to Defendants.

44.     In investing and holding client assets in higher-cost share classes, Cetera Advisors

and Cetera Advisor Networks were, at least, negligent.  Cetera Advisors and Cetera Advisor

Networks failed to use ordinary care under the circumstances, failing to exercise the care that a

reasonable investment adviser would use in making a client investment.

### Similarly Situated Advisory Clients Were Treated Differently.

45.     For certain mutual funds, Cetera Advisors and, based on information and belief,

Cetera Advisor Networks had Mutual Fund Buy Lists that allowed their IARs to purchase

higher-cost share classes for existing clients who already had a position in a mutual fund that

paid 12b-1 fees to Defendants, while also informing their IARs that they were required to

recommend and invest new clients in the "recommended" lower-cost share class that appeared

on the Mutual Fund Buy Lists.  Cetera Advisors and Cetera Advisor Networks did not disclose

this practice to their clients.

46.     In fact, Cetera Advisors and Cetera Advisor Networks did advise their clients to

hold higher-cost share classes of certain mutual funds despite knowing, as evidenced by their

appearance on the Mutual Fund Buy Lists, that lower-cost share classes of the same fund were

available to their clients and despite investing certain other clients in these available lower-cost

share classes.

47.     As such, Defendants' mutual fund share class practices resulted in them

improperly treating their advisory clients differently based almost exclusively on the timing of

their investment.

### Defendants Received Millions of Dollars in 12b-1 Fees as a Result of Breaching Their Fiduciary Duty.

48.     During the Relevant 12b-1 Period, Cetera Advisors and Cetera Advisor Networks received at least $10 million in 12b-1 Fees as a result of their investments of client assets in share classes that charged 12b-1 Fees that they would not have collected had those client assets been invested in the available lower-cost share classes of the same funds.

49.     Cetera Advisors and Cetera Advisor Networks failed to act in their clients' best interest, thereby breaching their fiduciary duty, by investing their client assets in and holding client assets in higher-cost share classes when they knew or should have known that lower-cost share classes of the same fund were available to their clients.

50.     Not until January 2017 did Cetera Advisors and Cetera Advisor Networks begin to rebate 12b-1 Fees that they received during and after January 2017 and started to convert their advisory clients' holdings to the lower-cost share class.  Defendants never rebated the at least $10 million of fees that were incurred during the Relevant 12b-1 Period.

### C.     Defendants Failed to Disclose Adequately Their Share Class Selection Practices, the Resulting Conflict of Interest, and Their Brochures Disclosures Regarding 12b-1 Fees Misled Advisory Clients.

51.     Cetera Advisors and Cetera Advisor Networks are obligated to provide full and fair disclosure of all material facts and has an affirmative obligation to employ reasonable care to avoid misleading their clients.  Defendants' duty to disclose all material facts includes a duty to tell their clients about all of their actual or potential conflicts of interest that might incline Cetera Advisors and Cetera Advisor Networks or their IARs to render investment advice that is not disinterested.

**Defendants' Receipt of 12b-1 Fees Created Significant Conflicts of Interest.**

52.     Cetera Advisors and Cetera Advisor Networks advisory clients were invested in mutual fund Class A shares that paid 12b-1 Fees, which they received and shared with their IARs.  Accordingly, Cetera Advisors and Cetera Advisor Networks and their IARs had a material conflict of interest with their clients because Cetera Advisors and Cetera Advisor Networks and their IARs had an incentive to have their clients invest in the higher-cost Class A shares, which was contrary to their advisory clients interest in being invested in the lower-cost Class I Shares.

53.     As a result of the availability of lower-cost Class I Shares, in a highly significant way, Cetera Advisors and Cetera Advisor Networks' interests were not aligned with their clients. In particular, Defendants had a financial incentive to select more expensive Class A shares for clients, since this allowed them to generate additional fees, when lower-cost Class I Shares were available for the same fund.

54.     Defendants knew or should have known that these conflicts of interest were material, because, among other things, a reasonable investor would want to avoid paying these fees, which had a material impact on how their investment performed.

**Defendants Were Required to File Forms ADV.**

55.     As investment advisers registered with the SEC, Cetera Advisors and Cetera Advisor Networks were required to provide the most current Brochure and any applicable Brochure Supplements to all their advisory clients and prospective clients prior to or concurrent with entering into an advisory agreement.  Cetera Advisors and Cetera Advisor Networks were also required to provide updated Brochures and Brochure Supplements or summaries of material changes to these documents to clients going forward.

56.      As fiduciaries, Cetera Advisors and Cetera Advisor Networks were required to provide their advisory clients with sufficient facts so that their clients can understand the conflicts of interests that Defendants had and the business practices that Defendants engaged in, so clients can give informed consent to such conflicts or practices or reject them.  When investment advisers, such as Cetera Advisors and Cetera Advisor Networks, have a conflict of interest, they must disclose the full extent of the investment adviser's interests in the transaction.

57.      Defendants knew or should have known that they were required by law to disclose all material facts, including their conflicts of interest, to their advisory clients because, among other reasons, the instructions to the Brochures provided such guidance.

58.      In particular, item 5 of ADV Part 2A, "Fees and Compensation," requires investment advisers, like Cetera Advisors and Cetera Advisor Networks, to disclose how they are compensated for their advisory services, "including asset-based sales charges or service fees" (*i.e.*, 12b-1 Fees), the conflicts of interest related to those fees, and generally describe how the adviser addresses the conflicts that arise.

59.      Investment advisers are also required to describe, in Part 2A, Item 14.A of Form ADV (Item 13.A of former Form ADV Part II), compensation received from "someone who is not a client" in connection with providing investment advisory services to clients, the conflicts of interest related thereto, and how the adviser addresses the conflict of interest.

60.      Similarly, Items 4 and 5 of the Brochure Supplements require disclosure of the supervised individuals' compensation for the sale of securities and other investment products to their clients, "including distribution or service ('trail') fees from the sale of mutual funds," any economic benefit provided to the individuals by non-clients for providing advisory services, and the incentives these types of compensation and benefits create.

61.     Moreover, the Form ADV and associated Brochures are designed to provide adequate disclosure to advisory clients so that they can understand the firm they are hiring to manage their investments and what economic incentives in the firm's business model might influence the firm's decision-making on the client's behalf.  It also provides a basis for the client to compare a particular firm's fees, compensation and other business practices with other firms that the client might be considering.

62.     A senior level executive of Cetera Advisors or Cetera Advisor Networks signed each Form ADV in effect from September 2012 through the present and certified under penalty of perjury that the information and statements made in each Form ADV, including exhibits and other information submitted, were true and correct and did not omit required information.

### Defendants Failed to Adequately Disclose Their Share Class Selection Practices and the Resulting Conflict of Interest.

63.     Throughout the Relevant 12b-1 Period, disclosures by Cetera Advisors and Cetera Advisor Networks regarding their receipt of 12b-1 Fees were insufficient, failed to provide clients with the necessary information to make an informed decision with respect to their mutual fund investments, and failed to disclose adequately the conflict of interest with their clients.  As a result, Cetera Advisors and Cetera Advisor Networks breached their fiduciary duty to their clients.

64.     Throughout the Relevant 12b-1 Period, Cetera Advisors and Cetera Advisor Networks:  1) failed to advise their clients that they were paying 12b-1 Fees that they would not have to pay if they were invested in available Class I Shares of the same mutual funds; and 2) failed to disclose their conflict of interest in advising their clients to invest in the higher-cost share classes of the same mutual funds.  Throughout the Relevant 12b-1 Period, Cetera Advisors and Cetera Advisor Networks advised their clients to invest in or hold mutual fund share classes

that charged 12b-1 Fees when lower-cost share classes of those same funds were available to those clients, and did not disclose such practices or their conflicts of interest associated with the additional compensation they received for doing so.

65.     From on or about March 1, 2013, through the end of the Relevant 12b-1 Period, Defendants generally disclosed in their Brochures that they "may" invest in load and no-load mutual funds that "may" pay 12b-1 Fees and that the availability of such fees created a conflict of interest.  However, Defendants' Form ADVs disclosures throughout the Relevant 12b-1 Period said nothing about the existence of multiple *share classes* within mutual funds, or their clear conflict of interest associated with Cetera's receipt of additional compensation by investing or holding client assets in higher-cost share classes when a lower-cost share class of the *same fund* was available.

66.     From on or about March 1, 2013, through the end of the Relevant 12b-1 Period, Defendants' disclosures about a *potential* conflict of interest because accounts "may" invest in mutual funds that "may" pay 12b-1 Fees were also inadequate because Defendants were aware of a recurring, *actual* conflict of interest whereby their IARs routinely selected share classes paying 12b-1 Fees when less expensive share classes were available to Defendants' advisory clients for the same fund.

67.     Throughout the Relevant 12b-1 Period, Cetera Advisors and Cetera Advisor Networks failed to disclose that many mutual funds offer multiple share classes, including those that were expressly designed for, or made available to, clients in fee-based advisory programs. By omitting any mention of share class distinctions, the disclosures by Cetera Advisors and Cetera Advisor Networks did not provide sufficient information from which clients could understand that their investment adviser would recommend, purchase, or hold a share class that

resulted in them receiving 12b-1 Fees when a less costly share class of the exact same mutual fund was available to clients.

68.     Throughout the Relevant 12b-1 Period, Cetera Advisors and Cetera Advisor Networks failed to provide full and fair disclosure of all material facts and to employ reasonable care to avoid misleading their clients.  These disclosure failures were omissions of material fact and were required to be disclosed to their advisory clients, and Defendants knew or should have known that they had a duty to disclose such information.

### Disclosures in Defendants' Brochures Regarding 12b-1 Fees Misled Their Advisory Clients.

69.     Cetera Advisors and Cetera Advisor Networks were obligated to provide full and fair disclosure of all material facts, and have an affirmative obligation to employ reasonable care to avoid misleading their clients.  In violation of this duty, Cetera Advisors and Cetera Advisor Networks made misleading statements to their advisory clients.

70.     From at least September 2012 through mid-June 2015, Defendants' Brochures disseminated to advisory clients, referring to the conflict of interest created by the 12b-1 Fees, represented that "[t]o help mitigate this conflict of interest, we monitor the sales activity of our advisors [IARs] to ensure that the products and services that they offer to you are appropriate for your specific situation."

71.     In reality, Defendants' disclosures were misleading, violated their fiduciary duty, and did not comply with the standard of care they owed to their advisory clients, because Defendants did not evaluate whether they had placed their advisory clients in the most favorable share class.

72.     By failing to disclose the actual conflict presented by the investing, recommending, or holding advisory client assets in mutual fund share classes that charged 12b-1

Fees when such clients were otherwise eligible to own less expensive share classes of the same funds, and then failing to conduct the review Defendants represented that they would perform to specifically address the conflict presented by their receipt of 12b-1 Fees, Defendants not only acted contrary to their representations to clients, but made it less likely that the disparate treatment of advisory clients with respect to share classes would ever come to light.

73.     In June 2015, Cetera Advisors and Cetera Advisor Networks removed the misleading disclosures regarding how they monitored sales activity described in the above paragraph, because they had not conducted any review of the 12b-1 Fees paid by client investments or whether advisory clients had been placed in the most favorable share class.

74.     Additionally, during the Relevant 12b-1 Period, Defendants Forms ADV Part 2Bs included the following disclosure:  "[Defendants maintain] a Code of Ethics requiring your Advisor *to always act in your best interest* and [maintain] a supervisory structure to monitor the advisory activities of your Advisor in order to reduce potential conflicts of interest."  (Emphasis added.)

75.     In light of Defendants' mutual fund share class selection practices described above, the Brochures and Brochure Supplements were misleading, violated Defendants' fiduciary duty, and did not comply with the standard of care that Cetera Advisors and Cetera Advisor Networks owed to their clients, in that Defendants' IARs did not act in their clients' best interest when they invested and held client assets in higher-cost share classes when lower-cost share classes of the same fund were available.  The Brochures and Brochure Supplements also were misleading, and did not comply with the standard of care that Defendants owed to their clients because they did not have a supervisory structure in place to monitor when their IARs failed to act in their clients' best interest by investing or holding client assets in more expensive

share classes.

76.      These disclosure failures were misleading statements of material fact and

Defendants knew or should have known that they had a duty to not misleadingly disclose such

information.  In making these false and misleading disclosures, Cetera Advisors and Cetera

Advisor Networks were, at least, negligent.  Defendants failed to use ordinary care under the

circumstances, failing to exercise the care that a reasonable investment adviser would use in

making disclosures to their clients.  The misleading Forms ADV and Brochures are identified

below.

**Specific Misleading Form ADVs and Brochures Regarding 12b-1 Fees.**

77.      For the period beginning no later than October 2012 through February 2013,

Cetera Advisors and Cetera Advisor Networks prepared, disseminated, and/or filed a Form

ADVs and Brochures - including, at least, Form ADVs and Brochures dated on or about October

2012 and January 2013 - that included the following disclosure:

> Load and no-load mutual funds may pay annual distribution charges, sometimes
> referred to as 12(b)-1 fees.  These fees are paid to us, with a portion passed on to
> your Advisor.  Because of the additional compensation that these payments
> represent, there is a financial incentive for your Advisor to recommend funds that
> pay 12(b)-1 fees over funds that have no fees or lower fees.  To help mitigate this
> conflict of interest, we monitor the sales activity of our Advisors to ensure that
> products and services they offer to you are appropriate for your specific situation.

> (Item 5, Fees and Compensation)

78.      For the period March 2013 through September 2014, Cetera Advisors and Cetera

Advisor Networks prepared, disseminated, and/or filed Form ADVs containing Brochures -

including, at least, Brochures dated in or about March 2013, April 2013, April 2013, May 2013,

October 2013, March 2014, and April 2014 - that contained the following disclosure:

> Accounts may invest in load and no-load mutual funds that may pay the firm
> annual distribution charges, sometimes referred to as 12(b)-1 fees.  The Firm

> will credit retirement accounts (i.e., ERISA and IRA accounts) for any 12(b)-1 fees received because of mutual fund investments by these accounts. When 12(b)-1 fees are paid to us, for investments made in Preferred and Prime non-retirement accounts, a portion is passed to your advisor. The Firm will retain 12(b)-1 fees received for Premier non-retirement accounts. Because of the additional compensation that these payments represent, there is a financial incentive for your advisor to recommend funds that pay 12(b)-1 fees over funds that have no fees or lower fees. To help mitigate this conflict of interest, we monitor the sales activity of our advisors to ensure that products and services they offer to you are appropriate for your specific situation. The firm may have an incentive to promote the Premier program over other advisory programs based on the 12(b)-1 fee retention. We mitigate this potential conflict of interest by reviewing the suitability of each new account as well as all transactions placed within Preferred, Prime and Premier.

> (Item 5, Fees and Compensation)

79.     For the period September 2014 through June 2015, Cetera Advisors and Cetera Advisor Networks prepared, disseminated, and/or filed Form ADVs containing Brochures - including, at least, Brochures dated on or about September 2014 and May 2015 - that contained the following disclosure:

> Accounts may invest in load and no-load mutual funds that may pay the firm annual distribution charges, sometimes referred to as 12(b)-1 fees. The Firm will credit retirement accounts (i.e., ERISA and IRA accounts) and Managed Wealth ADVANTAGE accounts for any 12(b)-1 fees received because of mutual fund investments by these accounts. When 12(b)-1 fees are paid to us, for investments made in Preferred and Prime non-retirement accounts, a portion is passed to your advisor. The Firm will retain 12(b)-1 fees received for Premier non-retirement accounts. Because of the additional compensation that these payments represent, there is a financial incentive for your advisor to recommend funds that pay 12(b)-1 fees over funds that have no fees or lower fees. To help mitigate this conflict of interest, we monitor the sales activity of our advisors to ensure that products and services they offer to you are appropriate for your specific situation. The firm may have an incentive to promote the Premier program over other advisory programs based on the 12(b)-1 fee retention. We mitigate this potential conflict of interest by reviewing the suitability of each new account as well as all transactions placed within Preferred, Prime and Premier.

> (Item 5, Fees and Compensation)

80.     For the period June 2015 through December 2016, Cetera Advisors and Cetera

Advisor Networks prepared, disseminated, and/or filed Form ADVs containing Brochures - including, at least, Form ADVs and Brochures on or about June 2015, February 2016, March 2016, May 2016, June 2016, July 2016, September 2016 and December 2016 - that contained the following disclosure:

> Accounts may invest in load and no-load mutual funds that may pay the firm annual distribution charges, sometimes referred to as 12(b)-1 fees. The Firm will credit retirement accounts (i.e., ERISA and IRA accounts) and Managed Wealth ADVANTAGE accounts for any 12(b)-1 fees received because of mutual fund investments by these accounts. When 12(b)-1 fees are paid to us, for investments made in Preferred and Prime non-retirement accounts, a portion is passed to your Advisor. The Firm will retain 12(b)-1 fees received for Premier non-retirement accounts. Because of the additional compensation that these payments represent, there is a financial incentive for your Advisor to recommend funds that pay 12(b)-1 fees over funds that have no fees or lower fees.
>
> (Item 5, Fees and Compensation)

81.      In sum, Cetera Advisors and Cetera Advisor Networks failed to disclose in their Forms ADVs and Brochures for the Relevant 12b-1 Period the actual conflict presented by their investing, recommending, or holding advisory client assets in mutual fund share classes that charged 12b-1 Fees when such clients were otherwise eligible to own less expensive share classes of the same funds. Defendants also failed to disclose in their Forms ADVs and Brochures that they did receive additional compensation as a result of their advisory clients' investment in more expensive share classes when a less expensive share class was available in the same fund.

**D.      Defendants Failed to Seek Best Execution.**

82.      Cetera Advisors and Cetera Advisor Networks have a fiduciary duty to their advisory clients to seek the best execution, which means to execute securities transactions for clients in such a manner that the client's total costs or proceeds in each transaction are the most favorable under the circumstances.

83.     When Defendants invested advisory clients' assets in higher-cost mutual fund share classes despite the availability of a lower-cost share class of the same fund Cetera Advisors and Cetera Advisor Networks breached their fiduciary duty to seek best execution for their clients.  Moreover, Cetera Advisors and Cetera Advisor Networks failed to disclose to their clients that best execution might not be sought for purchases of mutual funds with multiple available share classes.

84.     In investing and holding client assets in higher-cost share classes, Cetera Advisors and Cetera Advisor Networks were, at least, negligent.  Defendants failed to use ordinary care under the circumstances, failing to exercise the care that a reasonable investment adviser would use in executing transactions on behalf of their clients.

III.    **Defendants Failed to Adequately Disclose Their Conflicts of Interest Relating to Their Receipt of Revenue Sharing from the Clearing Broker.**

85.     During the Relevant Revenue Sharing Period, Cetera Advisors and Cetera Advisor Networks received compensation from a third-party broker-dealer, the Clearing Broker, as a direct result of them investing their advisory clients in mutual funds that were available on a specific platform offered by the Clearing Broker.  As a result of this arrangement, the interests of Cetera Advisors and Cetera Advisor Networks were in conflict with their clients.  The arrangement created financial incentives for them to select investments that would lead to greater compensation.  Cetera Advisors and Cetera Advisor Networks did not disclose this conflict to their advisory clients.

86.     Since at least April 2011, the Clearing Broker – which has an agreement with Cetera Advisors and Cetera Advisor Networks to provide trade execution and confirmation, record keeping, custody, and reporting services for Defendants' clients – offered its no-transaction-fee mutual fund program ("NTF Program") to Cetera Advisors and Cetera Advisor

Networks.  As part of the NTF Program, the Clearing Broker waived the transaction fees it would otherwise charge for purchases of mutual funds.

87.     The NTF Program had two sub-programs, NTF A and NTF B.  NTF A generally consisted of no-load mutual funds that did not pay sales commissions and NTF B was generally comprised of so-called "load" mutual funds where the Clearing Broker waived the applicable sales commissions if they were purchased in fee-based advisory accounts.

88.     Cetera Advisors and Cetera Advisor Networks participated in the Clearing Broker's NTF Program (including both sub-programs) since at least April 2011.

89.     The terms of the participation of Cetera Advisors and Cetera Advisor Networks in the NTF Program were set forth in agreement between each of them and the Clearing Broker, referred to as the Addendums to the Fully Disclosed Clearing Agreements with the Clearing Broker ("Addendums").  Pursuant to the Addendums, the Clearing Broker agreed, among other things, to share with Cetera Advisors and Cetera Advisor Networks a certain percentage of revenues the Clearing Broker received from mutual funds in the NTF A Program.  The Addendums, which a senior Cetera executive for either Cetera Advisors or Cetera Advisor Networks signed, were revised several times throughout the Relevant Revenue Sharing Period, but these provisions did not change.

90.     The revenue the Clearing Broker received from the mutual funds in the NTF A Program was tied directly to the amount of assets in these mutual funds.  In turn, the amount of revenue that the Clearing Broker shared with Cetera Advisors and Cetera Advisor Networks was tied directly to the amount of client assets they invested in the mutual funds in the NTF A Program.

91.     When Defendants chose a mutual fund for a client they had more than one mutual

fund to choose from, including the choice of selecting other investments or mutual funds that did not participate in the NTF A Program.  Defendants' receipt of compensation through the NTF A Program created a conflict of interest because it incentivized Cetera Advisors and Cetera Advisor Networks and their IARs to invest advisory client assets in mutual funds in the NTF A Program over other investments or mutual funds.  These conflicts of interest were material to Cetera Advisors and Cetera Advisor Networks investors, and Defendants knew or should have known that these conflicts of interest were material.

92.      From at least September 2012 through June 2015, Defendants' Brochures did not have any disclosures related to the compensation they received as a direct result of investing clients in mutual funds in the NTF A Program.  Defendants also did not have any disclosures concerning the conflict of interest this arrangement presented.  This arrangement incentivized Cetera Advisors and Cetera Advisor Networks to invest their clients in mutual funds in the NTF A Program over other investment alternatives.

93.      From at least June 2015, and lasting through February 2016, Defendants' Brochures disclosed that the Clearing Broker "may also" pay Cetera a share of the fees it received from mutual funds that participated in the NTF Program.  This disclosure was materially inaccurate.  In fact, Cetera Advisors and Cetera Advisor Networks did, in almost every instance, receive compensation as a result of them investing advisory client assets in mutual funds that participated in the NTF A Program.

94.      These disclosure failures were omissions of material fact, were required to be disclosed to Defendants' advisory clients, and Cetera Advisors and Cetera Advisor Networks knew or should have known that they had a duty to disclose such information.  In failing to disclose the Revenue Sharing and the resulting conflict, Cetera Advisors and Cetera Advisor

Networks were, at least, negligent.  They failed to use ordinary care under the circumstances, failing to exercise the care that a reasonable investment adviser would use in making disclosures to clients.

95.        Cetera Advisors and Cetera Advisor Networks failed to disclose such information in Brochures that were prepared, disseminated, and/or filed dated in Brochures – including, at least, Brochures dated on or about October 2012, January 2013, March 2013, April 2013, May 2013, October 2013, March 2014, April 2014, September 2014, May 2015, and June 2015.

96.        During the Relevant Revenue Sharing Period, Defendants received at least $4.1 million in revenue sharing payments from the Clearing Broker pursuant to the Addendum.

## IV.  Defendants Failed to Disclose Conflicts of Interest Relating to Their Receipt of Administrative Services Fee Revenue from the Clearing Broker.

97.        Beginning in approximately September 2014, Defendants began receiving another form of compensation from the Clearing Broker tied directly to them investing client assets in certain mutual funds.

98.        In approximately September 2014, Cetera Advisors and Cetera Advisor Networks each entered into two Administrative Services Agreements (collectively, the "ASAs") with the Clearing Broker in which they agreed to provide administrative services to the Clearing Broker such as handling client inquiries, maintaining client accounts, and trade correction processing.

99.        In exchange, the Clearing Broker agreed to pay Cetera Advisors and Cetera Advisor Networks a certain percentage of service fees they received from the NTF B Program mutual funds, as well as certain service fees they received from mutual funds participating in the Clearing Broker's "transaction-fee" mutual fund program ("TF Program").

100.        Specifically, according to the NTF B Program Administrative Services Agreement ("NTF B Program ASA"), the Clearing Broker agreed to pay Defendants 25% of the

service fees that the Clearing Broker received from all NTF B Program mutual funds.  In addition, according to the TF Program Administrative Services Agreement ("TF Program ASA"), the Clearing Broker agreed to pay Defendants $4.00 per "eligible position" per annum.

101.     As a result of the ASAs, the interests of Cetera Advisors and Cetera Advisor Networks were in conflict with their clients.  The agreements described above incentivized Defendants to recommend mutual funds for which they received additional compensation from the Clearing Broker under the ASAs over other investments when rendering investment advice to their advisory clients.  These conflicts of interest were material to the investors of Cetera Advisors and Cetera Advisor Networks, and Defendants knew or should have known that these conflicts of interest were material.

102.     During the Relevant Service Fee Period, Defendants failed to disclose the NTF B Program ASA through February 2016 and the TF Program ASA through March 2018.

103.     Defendants represented in the ASAs, all of which were signed by senior Cetera executives, that they had disclosed the ASAs to their advisory clients.

104.     These disclosure failures were omissions of material fact, were required to be disclosed to Defendants' advisory clients, and Defendants knew or should have known that they had a duty to disclose such information.  In failing to disclose the administrative service fee revenue and the resulting conflict, Cetera Advisors and Cetera Advisor Networks were, at least, negligent.  Cetera Advisors and Cetera Advisor Networks failed to use ordinary care under the circumstances, failing to exercise the care that a reasonable investment adviser would use in making disclosures to their clients.

105.     Cetera Advisors and Cetera Advisor Networks failed to disclose such information in Brochures prepared, disseminated, and/or filed in Brochures – including, at least, Brochures

dated on or about September 2014, May 2015, June 2015, February 2016, April 2016, May 2016,

June 2016, July 2016, September 2016, December 2016, January 2017, March 2017, April 2017,

June 2017, August 2017, and January 2018.

106.   During the Relevant Service Fee Period, Defendants received at least $4.3 million

in administrative service fees from the Clearing Broker under the ASAs.

**V.    Defendants Failed to Disclose Compensation They Received in the Form of Non-Transaction Mark-Ups on Charges Imposed by the Clearing Firm.**

107.   Since at least April 2011, Defendants' agreement with their Clearing Broker set

forth, in Schedule A to the Addendum, the fees they would pay to the Clearing Broker for

providing execution, clearing, and custody for their advisory clients.  Schedule A of that

agreement itemizes certain services that "may be billed directly to the client with a customized

markup," including, but not limited to, inactive account fees, mandatory reorganization fees,

bond redemption fees, legal transfer fees, outgoing account transfer fees, paper delivery

surcharges for client statements and confirms, confirmation fees, and wired funds fees.

Defendants could also direct the Clearing Broker to mark-up fees associated with the Clearing

Broker's asset management accounts that offer check writing and debit card capabilities, as well

as fees for traditional and ROTH IRA accounts.  This agreement also provided that Defendants

were responsible for notifying their clients of any mark-up.

108.   From at least September 8, 2012, Defendants' clients incurred such fees and, at

their request, the Clearing Broker added mark-ups to the Clearing Broker's fees for at least the

services identified above.  Defendants did not disclose in their Brochures or otherwise that they

would mark-up these non-transaction fees charged by the Clearing Broker.  These fees were

material to Defendants investors, and Defendants knew or should have known that these non-

transaction fee mark-ups were material.

109.     Upon request, clients could request a "Fee Schedule" from their IAR.  However, these schedules did not reveal the mark-up that Defendants directed the Clearing Broker to add to the non-transaction fees it was charging.  For example, from approximately April 2011 through August 2014, the fee schedules made available to Defendants' clients during that period show outgoing transfer fees of $95.00 (from August 2012 through December 2012) and $125.00 (from January 2013 through August 2014) per transfer, but do not reveal Defendants' mark-up of $70.00 or $100.00 per transfer.

110.     These undisclosed mark-ups on the Clearing Firm's non-transaction fees created a conflict of interest for Cetera Advisors and Cetera Advisor Networks because it created a financial incentive for Cetera Advisors and Cetera Advisor Networks to continue to use the Clearing Broker so they could continue to receive fees from non-transaction fee mark-ups. Cetera Advisors and Cetera Advisor Networks knew or should have known that it was a material omission to not disclose to their clients that they charged non-transaction fee markups.

111.     Cetera Advisors and Cetera Advisor Networks failed to disclose the conflict of interest arising from this financial incentive in the arrangement with the Clearing Broker.

112.     These disclosure failures were omissions of material fact, were required to be disclosed to Defendants' advisory clients, and Defendants knew or should have known that they had a duty to disclose such information.  In failing to disclose the mark-ups on non-transaction fees and the resulting conflict, Defendants were, at least, negligent.  Cetera Advisors and Cetera Advisor Networks failed to use ordinary care under the circumstances, failing to exercise the care that a reasonable investment adviser would use in making fee disclosures to clients.

113.     Cetera failed to disclose the existence and extent of such mark-ups and the corresponding conflicts of interest associated with their receipt of such undisclosed

compensation in, at least, Brochures prepared, disseminated, and/or filed in Brochures – including, at least, Brochures dated on or about October 2012, January 2013, March 2013, April 2013, April 2013, May 2013, October 2013, March 2014, April 2014, September 2014, May 2015, June 2015, February 2016, April 2016, May 2016, June 2016, July 2016, September 2016, December 2016, January 2017, March 2017, April 2017, June 2017, August 2017, and January 2018.

114.    During the Relevant Non-Transaction Fee Period, Defendants received at least $3.5 million in undisclosed mark-ups on non-transaction fees.

**VI.    Defendants Failed to Implement Their Written Policies and Procedures.**

    **A.    Defendants Maintained Policies and Procedures Requiring Disclosure of Material Facts and Conflicts of Interest, But Failed to Implement Those Policies.**

115.    From 2012 through at least 2017, all dated the first of the year, Cetera Advisors and, based on information and belief, Cetera Advisor Networks had written policies and procedures contained in their Written Supervisory Procedures ("WSPs") (Sections 16.1.2 and 16.1.4) and IAR Manuals (Sections 1.1 and 1.1.4) (collectively, "Compliance Manuals") for disclosing all material facts, including conflicts of interest that might incline Defendants and their IARs to render advice that is not disinterested. Defendants' written policies and procedures as set forth in their Compliance Manuals instructed that the firms and their representatives "should fully and accurately disclose the material facts regarding the true costs of any recommended product and disclose any actual or potential conflict of interest that could impair the objectivity" of the advisers and their representatives.

116.    Similarly, Defendants' Compliance Manuals (specifically, WSP Section 16.4) required that their IARs disclose to advisory clients in writing the existence of the conflict prior to entering into or renewing any advisory agreement that created any material conflict of interest

that could reasonably impair the rendering of unbiased and objective advice.

117.    Additionally, another section of Defendants' Compliance Manuals (specifically, WSP Section 16.1.2) instructed that an "[i]nvestment adviser and its [r]epresentatives should fully and accurately disclose the material facts regarding the true costs, benefits and limitations of any service or product recommended and disclose any actual or potential conflict of interest that could impair the objectivity" of the advisers or their representatives.

118.    Throughout the Relevant 12b-1 Period, Defendants failed to implement their written policies and procedures instructing them and their IARs to disclose the material facts regarding the true costs, benefits, and limitations of the products it recommended and the conflicts of interest associated with these recommendations.  Defendants, for example, did not disclose the true costs, benefits, or limitations of investing in specific mutual fund share classes that they recommended to their clients.  Nor did Cetera Advisors or Cetera Advisor Networks or their IARs disclose the conflict of interest arising from Defendants and their IARs receipt of 12b-1 Fees when less expensive share classes of the same fund were available.

119.    Throughout the Relevant Revenue Sharing Period, the Relevant Service Fee Period, and Relevant Non-Transaction Fee Mark-Up Period, Cetera Advisors or Cetera Advisor Networks failed to implement their written policies and procedures instructing them and their IARs to disclose the material facts regarding the true costs, benefits, and limitations of the products they recommended and the conflicts of interest associated with these recommendations. Cetera Advisors or Cetera Advisor Networks failed to implement their written policies and procedures instructing them and their IARs to disclose conflicts of interest associated with these recommendations by failing to adequately disclose conflicts of interest stemming from their receipt of:  (a) revenue sharing and administrative service fees revenue from the Clearing Broker

that was tied to the amount of advisory client assets in certain mutual funds and (b) mark-ups on non-transaction fees from the Clearing Broker.

120.     These practices were material to Defendants' investors, and Defendants knew or should have known that the above practices and the conflicts associated with them were material.

**B.     Defendants Maintained Policies and Procedures Requiring the Purchase of Share Classes on the Mutual Fund Buy Lists, But Failed to Implement That Policy.**

121.     Defendants' Compliance Manuals (specifically, WSP Section 16.6.6 and IAR Manual Section 6.6) instructed their IARs that they could only purchase program-approved funds and share classes that appeared on the Mutual Fund Buy Lists, and that IARs must recommend the "most favorable share class" to their clients.

122.     Defendants failed to implement these internal procedures designed to ensure that their IARs recommended or purchased less expensive share classes of certain funds included on the Mutual Fund Buy Lists when doing so was in an advisory client's best interest.

123.     Defendants failed to implement these policies throughout the Relevant 12b-1 Period, because IARs continued to invest, recommend, or hold client assets in higher-cost share classes when lower-cost share classes of the same fund were available to clients.

124.     These practices were material to Defendants' investors, and Defendants knew or should have known that the above practices and the conflicts associated with them were material.

125.     Defendants' failure to implement their policies and procedures resulted in advisory clients paying millions of dollars in unnecessary and undisclosed fees.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Defendants Violated Section 206(2) of the Advisers Act

126.     Paragraphs 1 through 125 are re-alleged and incorporated herein by reference.

127.     Cetera Advisors and Cetera Advisor Networks are investment advisers defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11).

128.     Cetera Advisors and Cetera Advisor Networks, while acting as investment advisers, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce engaged in transactions, practices, and courses of businesses which operated as a fraud or deceit upon clients or prospective clients.

129.     By reason of the foregoing, Cetera Advisors and Cetera Advisor Networks violated, and unless enjoined there is a reasonable likelihood that each of them will continue to violate, Section 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(2)].

**SECOND CLAIM FOR RELIEF**
**Defendants Violated Section 206(4) & Rule 206(4)-7 of the Advisers Act**

130.     Paragraphs 1 through 125 are re-alleged and incorporated herein by reference.

131.     Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] provides that it is unlawful for an investment adviser to engage in an act, practice, or course of business which is fraudulent, deceptive, or manipulative. It further states that the SEC shall issue rules to define and prescribe measures to prevent such misconduct. Rule 206(4)-7 issued under the Advisers Act [17 C.F.R. § 275.206(4)-7] requires, among other things, that investment advisers adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and its rules. Investment advisers must also review the adequacy of those policies and procedures and the effectiveness of their implementation, at least annually.

132.     Cetera Advisors and Cetera Advisor Networks each failed to implement written policies and procedures reasonably designed to prevent their breach of fiduciary duty.

133.     By reason of the foregoing, Cetera Advisors or Cetera Advisor Networks has directly or indirectly violated, and unless enjoined each of them will likely again violate, Section

206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

## VII.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, the SEC respectfully requests that the Court:

### I.

Find that Cetera Advisors and Cetera Advisor Networks each committed the violations alleged in this Complaint.

### II.

Enter injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Cetera Advisors and Cetera Advisor Networks and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from further violating Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-7 thereunder [15 U.S.C. §§ 80b-6(2), 80b-6 (4), and 80b-7 and 17 C.F.R. § 275.206(4)-7].

### III.

Order Cetera Advisors and Cetera Advisor Networks to each disgorge any and all ill-gotten gains, together with pre-judgment interest, derived from the activities set forth in this Complaint.

### IV.

Order Cetera Advisors and Cetera Advisor Networks to each pay civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### V.

Grant such other relief as this Court may deem just or appropriate.

## **JURY DEMAND**

The Commission demands a trial by jury on all claims so triable.

DATED:  April 29, 2020

s/ Christopher E. Martin
Gregory A. Kasper (Colo. Bar No. 46800)
Christopher E. Martin (AZ Bar No. 018486)


Telephone: (303) 844-1000
Email:  kasperg@sec.gov
            martinc@sec.gov

Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO  80294-1961
Telephone: (303) 844-1000
Fax: (303) 297-3529

Andrew Shoenthal (IL Bar No. 6279795)
Malinda Pileggi (IL Bar No. 6324500)

Email:  shoenthalA@sec.gov
            pileggiM@sec.gov

Securities and Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, IL 60604
Telephone:  (312) 353-7390

*Attorneys for Plaintiff*
*Securities and Exchange Commission*